United States Court of Appeals,

Eleventh Circuit.

No. 93-9382.

UNITED STATES of America, Plaintiff-Appellee,

v.

Gary FROST, Major, George Johnson, Defendants-Appellants.

April 23, 1998.

Appeals from the United States District Court for the Middle District of Georgia. (No. CR 93-31-MAC(WDO), Wilbur D. Owens, Jr., Judge.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES.

Before HATCHETT, Chief Judge, HENDERSON, Senior Circuit Judge, and YOUNG[*], Senior District Judge.

PER CURIAM:

This case is before the Court on remand from the United States Supreme Court for further consideration of its earlier opinion in light of *Joyce Johnson v. United States,* --- U.S. ----, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

BACKGROUND

A five count superseding indictment was filed on May 23, 1993, charging George Johnson, Gary Frost, and Edward Wayne Martin, in Count One with attempting to obstruct, delay and affect commerce, in violation of 18 U.S.C. Section 1951 (the Hobbs Act); in Count Two with conspiracy to extort a thing of value by mailing a threatening communication, in violation of 18 U.S.C. Section 876; and in Count Three with the substantive offense of extortion. In Count Four, Edward Martin,

[*]Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

and in Count Five, George Johnson, were also charged with making false statements before a federal grand jury in violation of 18 U.S.C. Section 1623. The jury returned a verdict of guilty on all counts.

In its opinion dated August 25, 1995, (61 F.3d 1518) this Court affirmed the convictions but reversed and remanded the sentences. That opinion was later modified on March 19, 1996 (77 F.3d 1319) holding that the evidence was insufficient to support Hobbs Act jurisdiction allegations contained in Count One of the indictment.

George Johnson and Gary Frost then filed a petition for writ of certiorari to the Supreme Court. Edward Martin did not join in that petition. Appellant Johnson contended this Court erred in failing to apply *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) to his conviction under Count 5 even though *Gaudin* was decided after the trial but before this Court had decided his appeal.

## FACTS

The evidence at trial showed that Edward Martin was elected Mayor of the town of Warner Robins, Georgia in 1988. Appellant George Johnson was the Police Chief of Warner Robins and Appellant Gary Frost was a police department Major in charge of the patrol and criminal investigative divisions. As Mayor, Martin supervised Johnson; as Police Chief, Johnson supervised Frost. All three Defendants, Martin, Johnson and Frost, were accused of conspiring to mail a videotape and a note to William Douglas, a twelve-year member of the Warner Robins City Council, for the purpose of causing Douglas to resign from the City Council.[1]

---

[1]The videotape showed Douglas, a married man, in a car with a woman who was not his wife. Douglas was meeting with the woman on federal property when, unbeknownst to Douglas, the tape was made.

2

After taking office as Mayor, disputes arose between Martin and city council members as to the manner in which Warner Robins should be run.[2] Douglas drafted—and the council passed—several ordinances which reduced the Mayor's spending authority. On April 22, 1991, four months after Douglas had sponsored the ordinances, he received a package through the mail which contained a videotape and an anonymous handwritten note which stated that the videotape would be given to the Mayor and Douglas' wife unless Douglas resigned immediately from the city council. On that particular date Douglas did not resign from the council, nor did he mention the tape and note to anyone. He testified at trial that he simply secured the tape and note in a plastic grocery bag and stashed them in his attic and didn't mention the matter to anyone.

Douglas further testified that on May 1, 1991, he received a call from Mayor Martin who wanted to meet with him. When he got to the Mayor's office, Martin told him that he had received a videotape in the mail which showed Douglas in a compromising position with a woman who was not his wife, that it looked pretty bad and that as Mayor he was going to have to take it to the council. Douglas then said that he would tell the council about it himself.

That same evening, following a regularly scheduled council work session, Douglas requested a closed executive session to discuss a personal matter. During that closed meeting he told the council members and the city attorney about the videotape, the note, and his relationship with another woman. He explained that the note demanded his resignation or that copies would be provided to his wife and the Mayor. He also told them that the Mayor had already received a copy of the videotape. Douglas did not resign his council seat.

---

[2]In addition, there was testimony that "rumors" were being circulated to the effect that Douglas was considering running for the office of mayor in the next election.

Appellants Frost and Johnson did not dispute that the videotape had been made on April 16, 1991, at the direction of Johnson and with Frost's participation, using a video camera owned by the Warner Robins Police Department. Testimony at trial established that Johnson had two copies of the videotape made on the same day the videotape was filmed; later that day, Frost and Johnson assembled in Martin's office to view one copy of the tape, which was left with Martin after the viewing. Testimony further revealed that two additional copies of the video were made a few days later.

Expert testimony at trial showed that the copy of the tape sent to Douglas was a "first generation" copy, i.e., one made directly from an original tape. The evidence reflected that, as of April 19, 1991, the day the tape was mailed to Douglas, three additional copies of the tape existed, in addition to the 8 mm tape which was used when the incident actually occurred.. The original tape was in the possession of Johnson; the three copies consisted of a copy that Johnson had and which he later gave to Kathy Woodham, his former secretary; a copy given to Wiley Bowman, the Director of Public Works for Warner Robins, who had participated in the surveillance of Douglas; and a copy given to Martin on April 16, 1991.

DISCUSSION

In determining the extent of this Court's review on remand it is necessary to determine to which appellants and counts *Joyce Johnson v. United States,* --- U.S. ----, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) applies. In the *Joyce Johnson case,* the Supreme Court held that materiality is an element of an offense under 18 U.S.C. Section 1623 and that *Gaudin* dictates that materiality be decided by the jury. In these appeals, the only counts of conviction that relate to false statements

or perjury are Counts 4 and 5, the perjury charges under Section 1623 against Martin and Johnson, respectively.

While Martin was charged with and convicted of perjury in Count 4, he appealed only his sentence and did not join in the petition for certiorari. He is therefore precluded from challenging his conviction for perjury on the basis of the *Joyce Johnson* case.

As appellant Frost was not charged with or convicted of perjury, his conviction on Counts 2 and 3 are not involved in the remand pursuant to the *Joyce Johnson* case.

That leaves remaining only the issue of whether the trial court's failure to have the jury determine materiality in George Johnson's trial on Count Five requires noticing pursuant to Rule 52(b) of the Federal Rules of Criminal Procedure.

At the time of trial, Appellant Johnson did not object to the trial court's determining the issue of materiality, recognizing that that procedure was in accord with then current law. However, Appellant Johnson did object to the trial court's determination that materiality had been proven by the government. In *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Supreme Court noted that "no procedural principle is more familiar to this Court than that a constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." However, the *Olano* Court also reaffirmed that a court may take notice of an error pursuant to Rule 52(b) of the Federal Rules of Criminal Procedure, which reads:

> "(b) Plain Error. Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

In *Joyce Johnson* the Supreme Court stated:

5

"... before an appellate court can correct an error not raised at trial, there must be (1) "error,' (2) that is "plain,' and (3) that "affect[s] substantial rights.' *Olano,* 507 U.S. at 732, 113 S.Ct. at 1776. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error " " "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " ' *Ibid.* ( quoting *United States v. Young,* 470 U.S. at 15, 105 S.Ct. at 1046, in turn quoting *United States v. Atkinson,* 297 U.S. 157, 160[56 S.Ct. 391, 392, 80 L.Ed. 555] (1936))." *Joyce Johnson* at ----, 117 S.Ct. at 1549, 137 L.Ed.2d at 727.

The Government has conceded that in this case, as to Appellant Johnson's claim under Count 5, there was "error" under Gaudin, which satisfied the first condition of *Joyce Johnson* and *Olano,* and that the error was "plain error" under *Gaudin,* satisfying the second condition.

As to the requirement that the error "affected substantial rights" the issue is not as clear. *Joyce Johnson* reaffirmed a necessity that the error fit within a limited class of cases in which the Supreme Court has already determined that there is a "structural error" affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.[3] The Court went on to specifically note that the failure to submit materiality to the jury "can just as easily be analogized to improperly instructing the jury on an element of the offense, ... an error which is subject to harmless-error analysis, as it can be to failing to give a proper reasonable-doubt instruction altogether." *Id.* at ----, 117 S.Ct. at 1550.

---

[3]"A "structural' error, we explained in *Arizona v. Fulminante,* is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself,' 499 U.S. at 310, 111 S.Ct. at 1265.  We have found structural errors only in a very limited class of cases:  See *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (a total deprivation of the right to counsel);  *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (lack of an impartial trial judge);  *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (unlawful exclusion of grand jurors of defendant's race);  *McKaskle v. Wiggins.* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (the right to self-representation at trial);  *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (the right to a public trial);  *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (erroneous reasonable-doubt instruction to jury)".  *Joyce Johnson v. United States,* --- U.S. at ---- - ----, 117 S.Ct. at 1549-50.

6

Even assuming that the failure to submit materiality to the jury affected substantial rights, this case does not meet the final requirement of *Joyce Johnson* and *Olano*. In *Joyce Johnson,* the Supreme Court concluded that the forfeited error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings because the evidence supporting materiality was overwhelming at trial. *Id.*

In this case the evidence supporting the materiality of Appellant Johnson's testimony was overwhelming as well. The number of copies of the tape, and their disposition, was material to the investigation of any conspiracy and Johnson's involvement in it concerning the mailing of the tape to councilman William Douglas and the extortion plot. It was therefore material for the grand jury to ascertain if Johnson had a copy of the tape and whether he had permitted anyone else to view that tape.

The record shows that Johnson testified to the grand jury that he did not know what had happened to his copy of the tape and that he had not allowed any other person other than his wife to view it.

Count Five of the superseding indictment in this case charged as follows:

"That on or about January 22, 1993, in the Macon Division of the Middle District of Georgia, and elsewhere within the jurisdiction of this court,

GEORGE JOHNSON,

defendant herein, having duly taken an oath to tell the truth in a proceeding before a grand jury of the United States in the Middle District of Georgia, did willfully and knowingly and *contra* to said oath, state material matters which he did not believe to be true, that is to say:

1. At the time and place aforesaid, defendant GEORGE JOHNSON appeared before a grand jury of the United States and was placed under an oath to tell the truth.

2. At the time and place aforesaid in paragraph 1 herein, it was also material to the proceeding for the grand jury of the United States to determine if the defendant, GEORGE

7

JOHNSON, had in his possession a copy of a videotape depicting William Douglas together with a female not his wife;

3. At the time and place aforesaid in paragraph 1 herein, it was also material to the proceeding for the grand jury of the United States to determine if the defendant, GEORGE JOHNSON, had allowed anyone other than himself to view the videotape in his possession depicting William Douglas together with a female not his wife;

4. At the time and place aforesaid in paragraph 1 herein, defendant GEORGE JOHNSON, appeared as a witness before the grand jury, and then and there being under oath to tell the truth, testified falsely with respect to material matters as follows, such statements by the defendant being made in response to questions put to him by a duly authorized Assistant United States Attorney:

Q. First, there was a copy for the Mayor. Then there was a copy for Wiley Bowman. Then there was a second copy for the Mayor.

A. Right.

Q. And then you got a copy?

A. Four total tapes.

Q. You got the standard size copy?

A. Yes, Ma'am.

Q. And where is that?

A. I don't know.

Q. What happened to it?

A. I took the tape home and showed Jackie, my wife, and had her review it.

Q. Why?

A. I wanted her opinion, too.  I wanted to see if she saw what I saw or what she didn't see.  In fact, she reviewed the entire file with me.  I think I left it at the house, and there is about 50 tapes at the house.  I've been through all my tapes at the house.  I've been through all my tapes at the office.  And to be quite honest with you, I think that perhaps Mark or Jeff—

Q. Those are your sons?

8

A. Yes.—taped over it. I mean, I have looked every place, and if you care to call Jackie at Robins Air Force Base, you can certainly do that because she did review it, and I asked her to review it ...

Q. Other than you wife, Jackie, have you shown the video to anyone else?

A. No, Ma'am ...

5. At the time and place aforesaid in paragraph 1 herein, defendant GEORGE JOHNSON while under oath to tell the truth testified falsely with respect to material matters as follows, such statements being made by the defendant in response to questions put to him by a grand juror:

THE WITNESS: Yes, sir. I cannot find the tape that I had....

THE WITNESS: I don't know. I took it home. I reviewed it. I let Jackie look at it. I didn't send it to anyone. If you want to talk to Jackie, you can certainly feel free to do that.

6. The aforesaid testimony of defendant, GEORGE JOHNSON, as he then and there well knew and believed, was not true, in that GEORGE JOHNSON had given the copy of the above-mentioned videotape in his possession to an individual not associated with the police department for that individual's viewing, all in violation of 18 USC Section 1623."

The evidence at trial sufficiently proved that at the time Appellant Johnson gave those answers before the grand jury that he knew them to be untrue because he had given a copy of the videotape to an individual named Kathy Woodham. The evidence showed that Kathy Woodham had been a former secretary to George Johnson but that at the time Johnson gave her a copy of the tape in 1991 she no longer worked for the police department and no longer lived in Warner Robins. Kathy Woodham testified at trial that George Johnson had given her a copy of the videotape sometime before August of 1991 and asked her to give him a photographic opinion. She further testified that she kept the videotape until March 1993, after Johnson's grand jury testimony, and that her husband actually mailed the tape to Johnson. That tape was later recovered from Johnson's office at the Police Department during the execution of a search warrant.

9

As was observed in *Joyce Johnson,* Appellant Johnson has presented no convincing argument that the false statement for which he was convicted, i.e., lying under oath about persons to whom he had provided copies of the videotape, was somehow not material to the grand jury investigation as is provided in *Joyce Johnson.* The record does not provide a basis for concluding that the error seriously affected the fairness, integrity, or public reputation of any judicial proceeding and no miscarriage of justice will result by this Court declining to notice error under Rule 52(b).

CONCLUSION

In accordance with the reasons set forth above, the convictions of Appellants Frost and Johnson are AFFIRMED.