[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15207
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cr-20701-JLK-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANJA KARIN KANNELL,
JOSEPH HARVEY,

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(November 18, 2013)

Before WILSON, PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Anja Kannell and her husband, Joseph Harvey, appeal their convictions and

sentences for offenses they committed in a scheme to defraud disaster relief

agencies.  Kannell was convicted and sentenced to 159 months of imprisonment for 12 counts of mail fraud, 18 U.S.C. § 1341, 13 counts of wire fraud, id. § 1343, 6 counts of access device fraud, id. § 1029(a)(2), (b)(1), and 4 counts of aggravated identity theft, id. § 1028A(a)(1), (c)(5).  Harvey received the same sentence following his convictions for 13 counts of mail fraud, id. § 1341, 16 counts of wire fraud, id. § 1343, 7 counts of access device fraud, id. § 1029(a)(2), (b)(1), and 4 counts of aggravated identity theft, id. § 1028A(a)(1), (c)(5).  Kannell and Harvey challenge the denial of Kannell's motion to dismiss six counts of the indictment; several evidentiary rulings; the treatment of a "claim number" as an "access device"; and the calculation of the amount of intended loss and the number of victims of their fraud for sentencing purposes.  Kannell also challenges the reasonableness of her sentence and, for the first time, an alleged violation of the Speedy Trial Act and the warrantless search of a storage unit rented by Harvey. We affirm.

The district court did not err by denying Kannell's motion to suppress evidence recovered from her computers.  Kannell extinguished any reasonable expectation of privacy she had in the computers by allowing her daughter to retrieve the machines from Kannell's hotel room to sell them.  See United States v. Jacobsen, 466 U.S. 109, 117, 104 S. Ct. 1652, 1658 (1984).  When later confronted

2

by agents of the United States Postal Inspection Service, Kannell's daughter had, at the least, common authority over the computers to give them to the agents. See United States v. Matlock, 415 U.S. 164, 170–71 & n.7, 94 S. Ct. 988, 993 & n.7 (1974). And the district court did not clearly err in finding that Kannell's daughter relinquished the computers voluntarily. See United States v. Long, 866 F.2d 402, 404–05 (11th Cir. 1989). Kannell's daughter testified that she was "uncomfortable" with the agents coming to her residence, but she acknowledged that she consented in writing to a search of the computers and that she knew she was free to end the encounter with the agents. Harvey, for the first time on appeal, adopts Kannell's argument regarding the motion to suppress, but Harvey waived this issue by not raising it before trial and fails to provide any good cause to excuse that waiver. See Fed. R. Crim. P. 12(b)(3); United States v. Lall, 607 F.3d 1277, 1288 (11th Cir. 2010).

The district court also did not abuse its discretion by admitting evidence, under Federal Rule of Evidence 404(b), about Kannell and Harvey's involvement in similar, uncharged fraudulent activities. During the investigation, agents obtained claim forms showing that Kannell and Harvey filed about 200 fraudulent applications for unemployment relief with five disaster relief agencies using the names of individuals whose identities Kannell and Harvey had stolen. The agents

3

also obtained records of bank accounts controlled by Kannell and Harvey establishing that they had made numerous deposits of fraudulently obtained federal income tax refunds and disaster relief payments.  Agents later arrested Kannell and Harvey and seized from their automobile numerous notebooks, claim forms, lists, computer disks, and more than 50 access devices that contained stolen personal identification information used to file false relief forms and income tax returns. This evidence was relevant to prove that Kannell and Harvey knew how to file fraudulent claims for disaster relief, were familiar with using stolen identities, and intended to steal and misuse personal identification information for personal gain. See United States v. Brown, 665 F.3d 1239, 1248 (11th Cir. 2011).  And the district court eradicated "[a]ny possible unfair prejudice" by instructing the jury during the trial and before deliberations that it could consider the noncharged conduct only as proof of Kannell and Harvey's intent and motive to commit the charged offenses.  See United States v. Spoerke, 568 F.3d 1236, 1251 (11th Cir. 2009).

The district court also did not err by refusing to dismiss six counts of the indictment charging Kannell and Harvey for defrauding Job Service North Dakota and the New York State Department of Labor.  Kannell argues, and Harvey adopts the argument on appeal, that the prosecutor violated their right to due process

4

under the Fifth Amendment by indicting them for the six offenses without sufficient proof, but "a grand jury indictment that is valid on its face may not be challenged on the ground that the grand jury acted on the basis of inadequate or incompetent evidence," In re Grand Jury Proceedings, 142 F.3d 1416, 1425 (11th Cir. 1998). Kannell and Harvey base their argument on the failure of the prosecutor to produce a transcript of specific portions of Postal Inspector Claudia Angel's testimony, but a transcript was never produced because the trial reporter's recording equipment malfunctioned. Although grand jury "proceedings must be recorded by a court reporter or by a suitable recording," the "validity of a prosecution is not affected by the unintentional failure to make a recording." See Fed. R. Crim. P. 6(e)(1). Kannell and Harvey argue, for the first time on appeal, that they were "hampered" in their ability to cross-examine Inspector Angel, but the Sixth Amendment entitles a defendant "only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Mills v. Singletary, 161 F.3d 1273, 1288 (11th Cir. 1998) (quoting United States v. Frost, 61 F.3d 1518, 1525 (11th Cir. 1995)). Kannell and Harvey also argue that the prosecutor violated the "spirit" of the Jencks Act, but the prosecutor was not required to produce a transcript that, without dispute, was never in its possession. See United States v. Naranjo, 634

5

F.3d 1198, 1211 (11th Cir. 2011).  Kannell further argues, for the first time, about the violation of her right to effective assistance of counsel and the rule of lenity, but we will not consider these arguments because they are raised for the first time in Kannell's reply brief.  See United States v. Lopez, 649 F.3d 1222, 1246 (11th Cir. 2011).

Kannell argues, for the first time, that the district court violated the Speedy Trial Act by sua sponte continuing the date for her trial without determining that the continuance served the ends of justice or outweighed her right to a speedy trial, see 18 U.S.C. § 3161(h)(7), but Kannell waived this argument.  The Act provides that a defendant is entitled to have her indictment dismissed if she is not tried within 70 days from the filing of the indictment, 18 U.S.C. § 3161(c)(1), but she waives the right to contest the timeliness of the prosecution by failing to "move for dismissal prior to trial," id. § 3162(a)(2).  Because Kannell failed to challenge the continuance earlier, the issue is not properly before us on appeal.  See United States v. Ambrose, 707 F.2d 1209, 1213 (11th Cir. 1983).

Kannell also, for the first time, argues that the district court plainly erred by admitting into evidence items recovered from a storage facility because they were obtained without a warrant in violation of the Fourth Amendment.  Kannell waived this argument because she moved to exclude the items solely under Rule 404(b)

6

and did not object when they were admitted into evidence.  See United States v. Miller, 22 F.3d 1075, 1080 (11th Cir. 1994) (refusing to consider "grounds for suppression . . . [that] were not meaningfully presented to, and thus not addressed by, the district court").  In the alternative, Kannell cannot establish plain error because the undisputed evidence established that a private individual transferred the items in the storage unit to law enforcement.  Nydia Cedillo, the manager for the storage facility, testified without dispute that she auctioned off Harvey's storage unit after he failed to pay several months' rent on the unit, despite agreeing to pay the rent after being arrested; the winning bidder gave Cedillo some items from the unit; and Cedillo delivered those items to Investigator Angel.  The Fourth Amendment "proscrib[es] only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official."  Jacobsen, 466 U.S. at 113–14, 104 S. Ct. at 1656 (internal quotation marks and citation omitted).  No Fourth Amendment violation occurred because Cedillo, a private individual, delivered the items to Investigator Angel.

The district court did not err by denying Harvey's and Kannell's motions to acquit them of five charges of access device fraud related to the Deepwater Horizon oil spill.  Harvey and Kannell argue that the claim numbers they

7

fraudulently obtained from the Gulf Coast Claims Facility did not qualify as "access devices" because the claim numbers did not give them access to anything of value, but we disagree. The term "access device" is broadly defined to include an "account number[] . . . or other means of account access that can be used, alone or in conjunction with another access device[] to obtain money, . . . or that can be used to initiate a transfer of funds." 18 U.S.C. § 1029(e)(1). Shandarese Garr, the manager for the Gulf Coast Facility, testified that claimants received unique claim numbers used to process and to service their claims for disaster relief and then directed payment by wire transfer or mail by providing the claim number in combination with another access device, such as a social security number. And Robert Passero, a fraud analyst for the Postal Inspection Service, testified about how the claim numbers assigned by the Facility "function[ed] as an access device" and how Harvey and Kannell used the claim numbers to have disaster relief payments deposited into accounts they controlled at the Security Services Federal Credit Union. Because the evidence established that Harvey and Kannell used the claim numbers fraudulently to obtain money and to initiate transfers of funds, see id., a jury could have reasonably found that the claim numbers qualified as access devices.

The district court did not clearly err in enhancing Harvey and Kannell's base

8

offense level for having more than 50 victims. The Sentencing Guidelines provide a four-level increase in a defendant's base offense level if his offense involved 50 or more victims. United States Sentencing Guidelines Manual § 2B1.1(b)(2)(B) (Nov. 2011). "[I]n a case involving means of identification[,] victim means (i) ["any person who sustained any part of the actual loss," id. § 2B1.1 cmt. n.1]; or (ii) any individual whose means of identification was used unlawfully or without authority." Id. § cmt. n.4(E). Although the parties argued at the sentencing hearing about whether persons had a pecuniary loss to qualify as victims under subsection (i), the district court based its decision on the definition of victims provided in subsection (ii). When Kannell argued that the persons identified by the government "didn't incur any pecuniary harm," the district court responded that the persons had suffered "the theft of identity." Later, the district court overruled Harvey and Kannell's objection to the enhancement based on its finding "that the actual number of victims who had their identity actually stolen, or were in the process of being stolen, exceeds 600 . . . [based on] the evidence of the notebooks" in which Kannell had kept a record of their false claims. Harvey and Kannell argue that the prosecutor failed to prove that the notebooks contained names of actual individuals, but the district court was entitled to rely on undisputed factual statements in the presentence investigation report that Harvey and Kannell stole

9

"other people's identities" to file fraudulent claims and that those victims fit a "common profile." See Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact."). For the first time in their reply briefs, Harvey and Kannell argue that applying the definition of "victim" in subsection (ii) violates the Ex Post Facto Clause, but our long-standing precedent precludes defendants from raising even constitutional "issue[s] for the first time in a reply brief," United States v. Magluta, 418 F.3d 1166, 1185 (11th Cir. 2005).

The district court also did not clearly err in determining that Harvey and Kannell intended to inflict a loss of more than $2.5 million. During trial, claims handlers for the five disaster relief agencies testified about the approximately 200 suspicious claims filed by Harvey and Kannell. Robert Passero, a fraud analyst for the Service, testified about how Harvey and Kannell filed fraudulent claims for disaster unemployment relief; fraudulently obtained federal income tax refunds; and traced the fraudulently obtained funds to deposits Harvey and Kannell made in numerous bank accounts. Before the sentencing hearing, Passero filed an affidavit to which he attached a chart that described each fraudulent claim for disaster unemployment relief, its amount, and whether the claim corresponded to an intended or actual loss. The chart showed that Harvey and Kannell filed false

10

claims for $1,205,114 in disaster relief for the Deepwater Horizon oil spill; $836, 912 for flooding in North Dakota; $260,520 for relief in Louisiana after Hurricanes Gustav and Ike; $246,408.34 for flooding in Mississippi; and $71,998 in New York after Tropical Storm Irene.  Although Harvey and Kannell were not indicted for all their claims for disaster relief, the uncharged claims constituted relevant conduct, see United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006), and the district court could consider that conduct in making a reasonable estimate of the loss, U.S.S.G. § 2B1.1 cmt. n.3(C).  Harvey and Kannell argue that the government used the maximum possible amount for each fraudulent claim, but the claims handlers for the disasters in North Dakota, Louisiana, and New York testified about using lower weekly benefits for some false claims and higher benefits for other claims.  Even if we were to assume that the government used the maximum possible loss amount, the loss calculation would still be reasonable.  The district court was entitled to find that, to support their lavish lifestyle, Harvey and Kannell intended to "get as much money as they possible could from the claims they were submitting," but "were apprehended before all of the losses and the monies could be paid."  See United States v. Willis, 560 F.3d 1246, 1251 (11th Cir. 2009) (affirming an estimate of loss based on "specific circumstantial evidence— mainly Defendant's course of conduct—to calculate the loss Defendant intended to

11

cause"). The district court did not clearly err in enhancing Harvey's and Kannell's base offense levels by 18 points for intending to cause a loss between $2.7 million and $7 million. See U.S.S.G. § 2B1.1(b)(1)(J).

The district court also did not abuse its discretion by sentencing Kannell to 159 months of imprisonment. The district court found that Kannell submitted hundreds of fraudulent claims to disaster relief agencies and the Internal Revenue Service with the "inten[t] [to cause a] loss of greater than $2.5 million"; stole the identification information of more than 600 persons; and achieved her crimes using "multiple bank accounts, multiple alias names, . . . access devices and fraudulent mail and sophisticated computer work." Kannell moved for a downward variance based on her lack of a criminal history and the need to provide for her child, but the district court reasonably determined that "[t]he seriousness of [Kannell's] offense outweighed [those] issues." The district court reasonably determined that a sentence around the middle of Kannell's advisory guideline range of 135 to 168 months of imprisonment would best address the statutory sentencing factors. See 18 U.S.C. § 3553(a). And the district court was entitled to consider conduct of which Kannell was acquitted, see United States v. Culver, 598 F.3d 740, 752 (11th Cir. 2010), and the charges brought against her husband as being "reasonably foreseeable . . . in furtherance of [their] jointly undertaken criminal activity,"

12

U.S.S.G. § 1B1.3(a)(1)(B).  Kannell argues that the consideration of acquitted conduct violated her right to due process under the Fifth Amendment and the Double Jeopardy Clause of the Sixth Amendment, but her arguments are foreclosed by our holding in Culver that relying on acquitted conduct does not "violate [a defendant's] constitutional rights."  598 F.3d at 753.  Kannell also argues that she should have received a lesser sentence than her husband, but the evidence established that she equally participated in the fraudulent conduct. Kannell's sentence is reasonable.

We **AFFIRM** Kannell's and Harvey's convictions and sentences.