[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. No. 15-14832

_____

D.C. Docket No. 0:15-cr-60107-JIC-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KEYIONA MARVETTE WRIGHT,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 14, 2017)

Before HULL, MARCUS and ROGERS,[*] Circuit Judges.

HULL, Circuit Judge:

_____

[*]Honorable John M. Rogers, United States Circuit Judge for the Sixth Circuit, sitting by designation.

From 2014 to 2015, defendant Keyiona Wright participated in a conspiracy to file fraudulent income tax returns and obtain tax refunds by using other people's personal identifying information, including social security numbers. After being found in an apartment with thousands of people's personal identifying information, Wright pled guilty to the crimes of identity theft and conspiracy to commit wire fraud. Wright appeals her sentences for those crimes. After review, and with the benefit of oral argument, we affirm in part and reverse in part as to her sentences.

## I. BACKGROUND

### A.    Indictment and Guilty Plea

On May 21, 2015, an indictment charged defendant Wright with (1) conspiring to commit wire fraud by filing fraudulent tax returns in the name of identity theft victims in order to obtain the refunds, in violation of 18 U.S.C. § 1349 (Count 1), (2) possessing 15 or more counterfeit and unauthorized access devices with the intent to defraud, in violation of 18 U.S.C. § 1029(a)(3) (Count 2), and (3) during and in relation to the felonies alleged in Counts 1 and 2, knowingly using the means of identification of another person without lawful authority, in violation of 18 U.S.C. § 1028A(a)(1) (Counts 3-7). For Counts 3 through 7, the indictment charged that Wright possessed the names and social security numbers of five different people.

2

Defendant Wright pled guilty to Counts 1 and 6, which respectively charged her with conspiracy to commit wire fraud and aggravated identity theft.  In exchange, the government agreed to dismiss the other five counts.

## B.     Factual Proffer for the Guilty Plea

With the plea agreement, defendant Wright and the government submitted a written factual proffer recounting the facts that "the government would have presented at trial."  Like the district court, we use the admitted facts in the written proffer in considering Wright's sentences.

In April of 2015, the Internal Revenue Service (the "IRS") began investigating the filing of certain fraudulent tax returns.  The IRS had discovered several fraudulent returns coming from the same Internet Protocol ("IP") address.  Specifically, between March 25, 2014 and October 14, 2014, at least 21 federal income tax returns, claiming $70,704 in refunds, were transmitted to the IRS from that same IP address.

By subpoenaing Comcast, the IRS learned that the IP address was assigned to a Florida apartment ("Apartment 104") from at least October 25, 2014 to April 22, 2015.  Between January 19, 2015 and April 26, 2015, another 23 federal income tax returns, claiming $63,518 in refunds, were transmitted to the IRS from that IP address.  At least two more tax returns, claiming $974 in refunds, were transmitted from that IP address between April 26, 2015 and May 6, 2015.  These

3

46 returns, filed from March 25, 2014 to May 6, 2015, came from the same IP address, were accepted by the IRS, and claimed refunds totaling $135,196.[1]

Of those 46 accepted tax returns, 36 contained similarly formatted email addresses from yopmail.com. Yopmail.com is a free email address service that allows users to create temporary email addresses.

In addition, between September 16, 2014 and May 5, 2015, 688 federal income tax returns, seeking refunds totaling $733,276, were sent from that same IP address associated with Apartment 104 but were rejected by the IRS. As discussed later, defendant Wright admitted that she lived at Apartment 104 during this time.

On May 7, 2015, the government executed a search warrant at Apartment 104. Defendant Wright, the sole lessee of Apartment 104, was present when the IRS agents arrived. During their search of Apartment 104, IRS agents found personal identifying information ("PII") for thousands of people in a number of places, including four notebooks with PII in them, piles of paper with PII scattered throughout Apartment 104, and pictures of PII including spreadsheets and documentation and text messages containing PII on a smartphone that Wright identified as hers.

---

[1]One victim, whose name and social security number appeared on a 2014 tax return sent from that same IP address at Apartment 104, confirmed that she (1) had not filed a tax return since 2012, (2) had never lived at the address listed on the return, and (3) had not earned the wages listed on the return.

4

The IRS agents also found "[t]wo unlocked electronic Notebook/Notepads computers on top of the dresser, with one evidencing on the screen numerous social security numbers and other PII information." During the search, "the electronic Notebook with the PIIs automatically locked." At the request of an IRS agent, defendant Wright provided the password, which unlocked the electronic Notebook.

In addition, the IRS agents found (1) a black trash bag and a maroon suitcase, which contained papers showing the PII of thousands of people, (2) 331 debit and credit cards, and (3) hundreds of pages of PII information, including applications for the Department of Labor. During the search, defendant Wright provided the IRS agents with the password for her laptop and smartphone. On one laptop, the agents viewed a video of Wright counting money.

Defendant Wright agreed to speak with the IRS agents. Wright told the agents that she (1) had rented Apartment 104 since September 2014; (2) had called Comcast to set up internet service about one week later; and (3) had paid her Comcast internet bill each month in cash.

The factual proffer explains that all items seized were sent to the IRS for analysis. That IRS analysis determined that the documents found in Apartment 104 contained: (1) "12,124 identities," (2) "331 debit or credit cards containing

5

account information," and (3) "2,090 identities . . . found on the computers and a flash drive." Thus, a total of 14,545 identities were compromised in the offense.

## C.    Presentence Investigation Report

In calculating defendant Wright's offense level, the Presentence Investigation Report ("PSI") held Wright responsible for $7,773,972 in intended losses. This intended loss amount included (1) $135,196 in total refunds on the 46 fraudulent income tax returns accepted by the IRS, (2) $733,276 in total refunds sought on the 688 fraudulent income tax returns rejected by the IRS, and (3) $6,905,500, representing $500 for each of the remaining 13,811 compromised identities found in Apartment 104.[2] In reaching this loss amount, the PSI relied on, and repeated, the facts set forth in the written factual proffer.

The PSI set defendant Wright's base offense level at seven, pursuant to U.S.S.G. § 2B1.1(a)(1) (2014). The PSI increased Wright's offense level by 20 levels, pursuant to § 2B1.1(b)(1)(K), because the loss was more than $7,000,000 but less than $20,000,000. The PSI then applied a six-level increase, pursuant to § 2B1.1(b)(2)(C), because the offense involved 250 or more victims. The PSI recommended against any offense level reductions for acceptance of responsibility or for a minor role. This resulted in a total offense level of 33.

---

[2]The 46 returns, the 688 returns, and the remaining 13,811 identities combined to total the 14,545 identities in the factual proffer.

6

In calculating defendant Wright's criminal history category, the PSI awarded one criminal history category point for each of the following misdemeanors: (1) driving with a suspended license on August 10, 2011, (2) driving with a suspended license on October 24, 2011, (3) driving with a suspended license on November 26, 2011, (4) possession of 20 grams or less of marijuana on March 3, 2013, and (5) possession of 20 grams or less of marijuana on September 17, 2015. This fifth crime occurred while Wright was on pretrial release for the instant federal identity theft and wire fraud crimes.

The PSI noted that U.S.S.G. § 4A1.1(c) (2014) provides for one additional criminal history category point for each prior sentence, other than those with at least 60 days of imprisonment, up to "a maximum of four points." All five of defendant Wright's criminal history category points fell under this section, so the PSI counted only four of them. Four criminal history category points gave Wright a criminal history category of III.

Based on a total offense level of 33 and a criminal history category of III, the PSI calculated an advisory guidelines range of 168 to 210 months' imprisonment. The PSI also explained that Count 6 carried with it a statutorily required prison term of 24 months to run consecutively to any other sentence. See 18 U.S.C. § 1028A(a)(1).

7

**D.    2015 Sentencing Guidelines Reduced Wright's Guidelines Range**

Defendant Wright's sentencing occurred on October 23, 2015, only eight days before the effective date of new Sentencing Guidelines that would provide Wright a more favorable guidelines calculation. As a result, the parties and the district court agreed to use the revised Sentencing Guidelines, which reduced Wright's total offense level from 33 to 25 and cut her advisory guidelines range by more than half to 70 to 87 months' imprisonment.

Specifically, the application of the 2015 Sentencing Guidelines reduced defendant Wright's loss amount increase from 20 levels to 18. Under the 2015 guidelines, a 20-level increase now applied only if the loss amount was over $9,500,000 and an 18-level increase applied if the loss amount was between $3,500,000 and $9,500,000. U.S.S.G. § 2B1.1(b)(1)(J)-(K) (2015). Under the 2014 Sentencing Guidelines, a loss amount over $7,000,000 would have resulted in a 20-level increase. U.S.S.G. § 2B1.1(b)(1)(K) (2014). Because the loss amount attributed to Wright was $7,773,972, she now qualified only for the 18-level increase under the 2015 Sentencing Guidelines. Accordingly, Wright's offense level attributable to the loss amount was two levels less than what the PSI had calculated.

The 2015 Sentencing Guidelines also contained a revision about victims in § 2B1.1(b)(2)(C). The 2014 version of § 2B1.1(b)(2)(C) provided for increasing

8

defendant Wright's offense level by six if her offense involved 250 or more victims. U.S.S.G. § 2B1.1(b)(2)(C) (2014). The 2015 version replaced that provision, which was based solely on the number of victims, with a six-level increase if her offense "resulted in substantial financial hardship to 25 or more victims." U.S.S.G. § 2B1.1(b)(2)(C)(2015). At the sentencing hearing, the government conceded that it could not prove substantial financial hardship to 25 or more victims. The district court thus did not apply this six-level increase, even though the PSI had done so.

In short, under the 2015 Sentencing Guidelines, defendant Wright had a total offense level of 25 consisting of (1) a base offense level of seven and (2) an 18-level increase for the loss amount being over $3,500,000.

### E.    Objections to the Loss Amount of $7,773,972.

At sentencing, defendant Wright made two objections to the loss amount of $7,773,972. First, Wright objected to having any culpability for the 21 or so fraudulent tax returns from the same IP address that were filed <u>before</u> she moved into Apartment 104 on September 6, 2014. Second, Wright contended that the black trash bag and maroon suitcase were already in Apartment 104 when she moved in and that she was not responsible for the PII contained therein. In response to those two loss-amount objections, IRS Agent David Strager testified for the government.

9

Agent Strager had contacted Comcast about the IP address in question, and Comcast informed him that IP addresses are assigned to a cable modem and not to a location address or user. Comcast also told him that the IP address in question here "could have been assigned to another cable modem prior to October 25, 2014," but Comcast's records only went back to October 25, 2014. Strager further learned that, even though an individual can move with their cable modem, "most of the time" the IP address would change when the same modem was set up at a new address, although it does not always change.

Agent Strager also had contacted the property manager for Apartment 104 and discussed the procedures that occur before a new resident moves in. The property manager told Strager that when an apartment is vacated it is cleaned, repaired, and painted before a new tenant moves in. The property manager also told Strager that something left behind by a prior tenant would "absolutely not" still be in the apartment when a new tenant arrives. According to the property manager, defendant Wright's lease began on September 1, 2014, and she moved in on September 6, 2014.

Ultimately, the district court concluded that even excluding the approximately 21 tax returns filed before defendant Wright moved into Apartment 104, which claimed $70,704 in returns, the intended loss amount, which totaled $7,773,972, would still be well in excess of the $3,500,000 needed for the 18-level

10

increase under § 2B1.1(b)(1)(J)-(K) (2015). While the district court did not expressly rule on Wright's objection about the trash bag and suitcase, the district court included the PII identities in those containers in its loss calculation.

### F.    Objections to the PSI's Denial of Reductions for Minor Role and Acceptance of Responsibility

Defendant Wright further sought to reduce her offense level through a two-level minor role adjustment and objected to the PSI's recommended denial of that minor role reduction. The government stressed that Wright refused to discuss who else was involved. The district court denied Wright's minor role request because Wright failed to establish by a preponderance of the evidence that she was less culpable than the average participant in the conspiracy.

Defendant Wright also objected to the PSI's denial of a three-level reduction for acceptance of responsibility. Wright argued that it would be unfair to lose that 3-point offense level reduction because of her September 17, 2015 possession of a small amount of marijuana despite the fact that she was cooperative during the investigation, made admissions, and pled guilty. While acknowledging that Wright cooperated during the investigation and saved the government time and money by pleading guilty, the probation office still recommended denying Wright an adjustment for acceptance of responsibility because Wright violated her bond conditions by engaging in criminal activity. The government similarly pointed out that Wright was convicted of possessing marijuana while on pretrial release and

11

violated the specific conditions of that release.  The district court overruled Wright's objection but indicated it "could consider" her cooperation and the fact that her marijuana possession crime was only a misdemeanor when it weighed the 18 U.S.C. § 3553(a) factors.

## G.    Objections to the Criminal History Category

As to her criminal history category of III, defendant Wright objected to consideration of this same new September 17, 2015 arrest for misdemeanor possession of marijuana on the basis that there was an inadequate description of the contraband, an inadequate plea colloquy, and because Wright was unrepresented. The government responded by pointing out that Wright was arrested and convicted through a nolo contendere plea.  The district court overruled Wright's objections to the consideration of her September 17, 2015 marijuana possession.

The PSI recommended that defendant Wright receive one criminal history point for each of her three convictions for driving with a suspended license. Wright objected on the ground that she served only one sentence for all three citations and thus should receive only one criminal history point total.  The district court did not directly rule on this objection but calculated Wright's criminal history category as category III, which included three points for the suspended license convictions.

The district court calculated defendant Wright's total offense level as 25 and criminal history category as III, resulting in an advisory guidelines imprisonment range of 70 to 87 months on Count 1, plus the mandatory consecutive 24 months on Count 6. The district court found that a criminal history category of III overrepresented the seriousness of Wright's criminal history because all of her past convictions were misdemeanors. The district court also took into account the fact that Wright was denied acceptance of responsibility only because she possessed a small amount of marijuana on pretrial release. The district court sentenced Wright to 84 months in prison, consisting of 60 months on Count 1 and 24 months on Count 6, served consecutively, followed by three years of supervised release. In doing so, the district court varied downward by ten months (70 to 60) on the term of imprisonment for Count 1. The district court also ordered restitution in the amount of $3,884.

Defendant Wright timely appealed her sentence.

## II.  LOSS AMOUNT

For crimes involving fraud or deceit, such as this one, the Sentencing Guidelines increase the offense level based on the amount of the loss. U.S.S.G.

§ 2B1.1(b) (2015).  The "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A).[3]

Defendant Wright's loss amount was calculated based on an intended loss of $7,773,972.  The PSI calculated the intended loss amount by adding (1) $135,195 in refunds on 46 returns actually paid by the IRS, (2) $733,276 in refunds sought in 688 returns but rejected by the IRS, and (3) $6,905,500, representing $500 for each of the 13,811 remaining compromised identities found in Apartment 104.  Those 13,811 remaining identities included identities on 331 debit or credit cards.

The intended loss amount on all the tax returns totals $868,472.  Thus, the attributed loss amount in this case—over $3,500,000—depends on whether $500 is applicable to each of the remaining 13,811 compromised identities, or at least enough of them to increase the total loss over $3,500,000.  We thus review the relevant rules about this $500 calculation.

A.    **$500 Per Access Device**

This $500 calculation is found in the "Special Rules" in the guidelines, which apply to calculating the amount of loss.  U.S.S.G. § 2B1.1 cmt. n.3(F).  The Special Rules state that if the case involved any counterfeit or unauthorized "access device," the loss includes any charge made with the device but at least

---

[3]"Commentary and Application Notes to the Sentencing Guidelines are binding on the courts unless they contradict the plain meaning of the text of the Guidelines."  United States v. Murrell, 368 F.3d 1283, 1288 n.4 (11th Cir. 2004).

$500 per access device.  U.S.S.G. § 2B1.1 cmt. n.3(F)(i).  The guidelines commentary then explains that a counterfeit or unauthorized "access device" has the meaning given to these terms in 18 U.S.C. § 1029(e)(2)-(3).  U.S.S.G. § 2B1.1 cmt. n.10(A).  In turn, § 1029(e)(2) and (3) define "counterfeit access device" as "any access device that is counterfeit, fictitious, altered, or forged" and an "unauthorized access device" as "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud."  18 U.S.C. § 1029(e)(2)-(3).

Furthermore, § 1029(e)(1) provides the definition for the term "access device" and defines "access device" (used in § 1029(e)(2)-(3)) to include not only credit cards but also "any . . . personal identification number" that can be used to obtain anything of value:

> any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)

§ 1029(e)(1).  Given this broad definition, the question here is whether the 13,811 compromised identities qualified as "access devices" under any part of this definition.

The factual proffer established that the 13,811 identities included 331 debit or credit cards.  This Court has concluded that "access device" in § 1029(e)(1)

15

includes credit cards, debit cards, usernames and passwords, routing and bank account numbers, and merchant account numbers.  United States v. Taylor, 818 F.3d 671, 680 (11th Cir.) (credit cards), cert. denied, 137 S. Ct. 387 (2016); United States v. Klopf, 423 F.3d 1228, 1240 (11th Cir. 2005) (credit cards); United States v. Baldwin, 774 F.3d 711, 722 (11th Cir. 2014) (debit cards); United States v. Barrington, 648 F.3d 1178, 1202 (11th Cir. 2011) (usernames and passwords); United States v. Williams, 790 F.3d 1240, 1250 (11th Cir. 2015) (routing and bank account numbers, but only if not used on a paper check), cert. denied, 136 S. Ct. 918 (2016); United States v. Dabbs, 134 F.3d 1071, 1079-80 (11th Cir. 1998) (merchant account numbers).[4]

Thus, the loss amount of $165,500 from those 331 debit and credit cards ($500 times 331) was properly attributed to defendant Wright.  This increases the loss amount from $868,472 (from the tax returns) to $1,033,972.

## B.    Social Security Numbers

The factual proffer also establishes that "numerous" social security numbers were on one of defendant Wright's computers.  Although not binding, unpublished decisions of this Circuit have concluded that "[a] Social Security number can be an

---

[4]A merchant account number, for instance, is an "access device" because it is a "means of account access" that can be used in conjunction with another access device to obtain money, goods, or something of value.  Dabbs, 134 F.3d at 1080.  In Dabbs, the merchant account number allowed the defendants to deposit credit card sales into the account and then to access those funds.  Id. at 1079-80; see also United States v. Morris, 81 F.3d 131, 134 (11th Cir. 1996) (suggesting that the term "access device" should be limited "to those devices which access an individual account, such as a credit card or a long distance calling card").

16

access device" because § 1029(e)(1) lists a "personal identification number" as an access device. United States v. Siler, 624 F. App'x 990, 991 (11th Cir. 2015), cert. denied, 136 S. Ct. 1395 (2016); see also United States v. Wilson, 649 F. App'x 827, 829 (11th Cir. 2016) (duplicating social security numbers constituted production of unauthorized access devices), cert. denied, 137 S. Ct. 1064 (2017); United States v. Johnson, 645 F. App'x 904, 907 (11th Cir. 2016) (preparing and filing false tax returns using unauthorized social security numbers and other identifying information constituted production of unauthorized access devices); United States v. Kannell, 545 F. App'x 881, 886 (11th Cir. 2013) (explaining that a claim number was an access device used "in combination with another access device, such as a social security number").

Other circuits also have held that a social security number qualifies as a "personal identification number" and thus as an access device under § 1029(e)(1). See United States v. Sorensen, 937 F.2d 614 (9th Cir. 1991); United States v. Oladimeji, 463 F.3d 152 (2d Cir. 2006); United States v. Komolafe, 246 F. App'x 806, 811 (3d Cir. 2007).

We now hold that a social security number qualifies as an "access device" under the definition in 18 U.S.C. § 1029(e)(1) and for purposes of the Special Rules in the Sentencing Guidelines. There was thus no error in including in the

17

loss amount $500 for each of the "numerous" social security numbers shown on defendant Wright's computer.

## C.     "Personal Identifying Information"

While the 331 debit or credit cards and "numerous" social security numbers are "access devices," the remaining thousands of compromised identities are described only as "personal identifying information."  Neither the factual proffer nor the PSI defined or described the term "personal identifying information" or otherwise specified what types of information that term included.  That personal identifying information could be names and addresses, or it could be social security numbers, birthdays, telephone or cell phone numbers, or some combination of these or many other types of personal information.  We recognize that a "personal identification number" qualifies as an access device, but the problem is that the factual proffer and the PSI both used the term "personal identifying information" without describing what that information was.  Therefore, we agree with defendant Wright's argument on appeal that the record does not show what types of personal information were in the thousands of other PII found in Apartment 104.

Furthermore, only $1,033,972 of the total loss amount was attributable to the tax return refunds ($868,472) and debit or credit cards ($165,500), while $6,740,000 of the total loss amount came from the other thousands of PII multiplied by $500.   With a value of $1,033,972, the requested refunds and debit

18

or credit cards alone were insufficient to support defendant Wright's 18-level increase that was based on a loss amount over $3,500,000. See U.S.S.G. § 2B1.1(b)(1)(J)-(K) (2015). To increase the loss amount over $3,500,000, the government needed to show approximately 4,900 more of the 13,811 PII had "personal identification numbers" of some type or otherwise constituted access devices under the broad definition in § 1029(e)(1). The factual proffer stated "numerous" social security numbers but, even liberally construed, we cannot say that meant approximately 4,900 social security numbers or other types of access devices, which was needed to get the loss amount to over $3,500,000.

We also recognize that "[t]he guidelines do not require a precise determination of loss, and a court need only make a reasonable estimate of the loss, given the available information." United States v. Moran, 778 F.3d 942, 973 (11th Cir.) (internal quotation marks omitted), cert. denied sub nom. Huarte v. United States, 136 S. Ct. 268 (2015). However, there must be at least some evidence on which to base a reasonable estimate of how many remaining PII fell within the definition of an "access device" in order to trigger the $500 multiplier and to exceed the $3,500,000 loss threshold. The lack of description or definition for PII in the factual proffer or PSI means there is insufficient evidence to trigger that multiplier and make a reasonable estimate of the loss.

19

Accordingly, we must remand this case to the district court to address again, and make fact findings about, the loss amount. While defendant Wright objected to the loss amount, Wright did not articulate this specific evidentiary objection about the PII until on appeal. Thus, on remand, both the government and Wright may submit additional evidence as to what types of personal information were in the PII found in Apartment 104. See United States v. Washington, 714 F.3d 1358, 1362 (11th Cir. 2013) (explaining that this Court has discretion to permit the government to present evidence at resentencing in situations where the issue was not previously before the district court).

**D.    Black Trash Bag and Maroon Suitcase**

As in the district court, defendant Wright contends that she is not responsible for the PII found in the black trash bag and maroon suitcase because those items were in Apartment 104 when she moved in.

 "When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing 'sufficient and reliable' evidence to prove the necessary facts by a preponderance of the evidence." Id. at 1361.

The evidence sufficiently showed defendant Wright was responsible for the PII contained in the black trash bag and maroon suitcase. Wright lived in Apartment 104 for about eight months before the IRS agents executed the search

20

warrant.  The agents found Wright in Apartment 104 with PII scattered everywhere throughout the apartment as well as on her laptop and cell phone.  The property manager told Agent Strager that management cleaned out all apartments before new tenants arrived.  Based on those facts, the government proved, by a preponderance of the evidence, that the black trash bag and maroon suitcase belonged to Wright or her co-conspirators and was used as part of their fraudulent tax return scheme.  See Moran, 778 F.3d at 974 ("A district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy.").

As noted earlier, the district court implicitly, and properly, included the PII identities found in these containers in its calculation of the 13,811 compromised identities for which defendant Wright was accountable.  Nonetheless, as with the other PII, there was no description or definition of the types of PII in these containers, and thus we remand to the district court for fact findings about the types of PII in these containers, about which both parties may present additional evidence on remand.  See Washington, 714 F.3d at 1362.[5]

_____

[5]Wright also argues that she cannot be found responsible for fraudulent tax returns filed from the IP address before she moved into Apartment 104 in September 2014.  The district court declined to rule on the objections to the tax returns filed prior to September 2014 because doing so would not impact the guidelines calculation.  There were 21 tax returns filed before October 14, 2014 which sought refunds totaling $70,704.  On remand, and depending on the outcome of other calculations on remand, the district court may need to make fact findings about this issue too.

21

## III. MITIGATING ROLE ADJUSTMENT

The Sentencing Guidelines provide for a decrease from two to four points in a defendant's offense level if the defendant had a mitigating role in the offense. U.S.S.G. § 3B1.2 (2015). Defendant Wright, claiming she feared for her safety, refused to discuss who else was involved in the fraudulent tax return conspiracy and what their roles were. The district court denied Wright's request for a two-level minor role reduction because Wright "failed to establish by a preponderance of the evidence that she is less culpable than the average participant."[6]

A minor participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5. "In determining whether a minor-role adjustment applies, the district court should consider, first, the defendant's role in the relevant conduct for which he has been held accountable at sentencing, and, second, his role as compared to that of other participants in his relevant conduct." Moran, 778 F.3d at 980. Defendant Wright bears the burden of proving her minor role by a preponderance of the evidence. United States v. Bernal-Benitez, 594 F.3d 1303, 1320 (11th Cir. 2010).

---

[6]We review a district court's denial of a role reduction for clear error. Moran, 778 F.3d at 980.

The evidence in the record supports the district court's finding that defendant Wright did not meet her burden of proving her minor role. Wright kept thousands of people's PII in her apartment, on her cell phone, and on her laptop. See United States v. Rodriguez De Varon, 175 F.3d 930, 943 (11th Cir. 1999) (en banc) (explaining that the amount of contraband is relevant to the minor role analysis). Wright texted the PII to other, unknown people. The IRS agents also found a video of Wright counting the money. Wright admitted to her involvement in the conspiracy and her possession of PII for thousands of people. While Wright herself may not have filed the fraudulent tax returns, that fact does not necessitate the district court's finding that Wright had only a minor role. See id. at 944 (instructing courts not to grant a minor role reduction if the defendant only shows she had a minor role in the larger criminal conspiracy, instead of the relevant conduct).

Despite having the burden of proof, defendant Wright did not put forth evidence showing who else was involved or what their roles were. Without such evidence, the district court could not compare the roles of the other conspirators or "determine that the defendant was less culpable than most other participants in her relevant conduct." Id. The district court did not have to believe Wright's self-serving testimony as to her role, particularly given the evidence showing her extensive involvement.

23

The district court did not clearly err by denying defendant Wright a minor role reduction.

## IV.  ACCEPTANCE OF RESPONSIBILITY

The Sentencing Guidelines allow for a three-point reduction in the offense level when (1) the defendant "clearly demonstrates acceptance of responsibility," (2) the offense level was otherwise at least 16, and (3) the government files a motion in support:

> (a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.
>
> (b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1 (2015).

While out of jail on pretrial supervision, defendant Wright was arrested, convicted, and sentenced for the crime of possession of marijuana.  Although Wright had cooperated and entered a guilty plea in this current federal case, the

24

district court denied Wright a reduction for acceptance of responsibility because of her marijuana conviction during pretrial release.[7]

"The determination of whether a defendant has adequately manifested acceptance of responsibility is a flexible, fact sensitive inquiry." United States v. Smith, 127 F.3d 987, 989 (11th Cir. 1997) (en banc). "The defendant bears the burden of clearly demonstrating acceptance of responsibility and must present more than just a guilty plea." United States v. Sawyer, 180 F.3d 1319, 1323 (11th Cir. 1999).

One of the (many) factors to consider under the guidelines is whether the defendant voluntarily terminated or withdrew from criminal conduct or associations. U.S.S.G. § 3E1.1 cmt. n.1(B). In United States v. Pace, 17 F.3d 341, 342, 344 (11th Cir. 1994), this Court affirmed the district court's denial of an acceptance of responsibility reduction for a defendant, who was convicted of filing false individual income tax returns and claiming the refunds, when the defendant used marijuana while out on bond prior to pleading guilty. In doing so, this Court held "that a district court is authorized to consider subsequent criminal conduct, even if it is unrelated to the offense of conviction, in determining whether a

---

[7]This Court will not reverse the district court's determination that a defendant is not entitled to an acceptance of responsibility reduction "unless the facts in the record clearly establish that a defendant has accepted personal responsibility." United States v. Sawyer, 180 F.3d 1319, 1323 (11th Cir. 1999); see also U.S.S.G. § 3E1.1 cmt. n.5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.").

decrease for acceptance of responsibility is appropriate." Id. at 343.  In Pace, this Court concluded that "the district court did not err in considering Pace's subsequent marijuana use in declining to grant a decrease pursuant to § 3E1.1." Id. at 344.  Thus, evidence of continued, but unrelated, criminal conduct after an arrest supports denial of a § 3E1.1 reduction.

Pace is materially the same as this case.  Like the defendant in Pace, defendant Wright participated in a conspiracy to submit fraudulent individual tax returns to the government in order to obtain the refunds.  While on pretrial release, Wright illegally possessed marijuana.  Wright admitted to committing this crime.  Even on appeal, Wright candidly admits that the district court could, and should, have weighed the fact of her marijuana conviction.  The facts that Wright's arrest was a misdemeanor and that it was for marijuana possession do not establish that the district court erred in denying a § 3E1.1 reduction.  To the contrary, the district court has "great deference" to determine Wright's acceptance of responsibility, and this Court has upheld a district court's denial of an acceptance of responsibility reduction in factual circumstances similar to these.  See U.S.S.G. § 3E1.1 cmt. n.5; Pace, 17 F.3d at 344; see also United States v. Scroggins, 880 F.2d 1204, 1205, 1216 (11th Cir. 1989) (concluding that the district court did not err in denying a reduction under § 3E1.1 when the defendant continued to use cocaine after his arrest for stealing from postal stamp vending machines).  The district court thus did

26

not err when it denied Wright the benefit of an acceptance of responsibility reduction.

## V.  CRIMINAL HISTORY CATEGORY

A criminal history category of III applies when a defendant has four to six criminal history category points.  The guidelines assign one criminal history point, but only up to a total of four, for each prior sentence where the sentence of imprisonment was less than 60 days.  U.S.S.G. § 4A1.1(c) (2015).  A "prior sentence" is "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere."  U.S.S.G. § 4A1.2(a)(1) (2015).

The district court found defendant Wright had a criminal history category of III based on five points for five misdemeanors, only four of which counted under § 4A1.1(c).  Three criminal history category points resulted from Wright's driving with a suspended license on three separate occasions.  The other two criminal history category points resulted from Wright's twice possessing small amounts of marijuana.  Both sets of criminal history category points raise their own issues, which we address in turn.

## A.    Two Marijuana Possessions

The PSI stated that on September 17, 2015, a police officer found a bag of marijuana in defendant Wright's purse.  Wright was arrested for possessing 20

grams or less of marijuana.  The PSI stated the result: "Adjudication withheld; fine and costs."

Furthermore, in discussing defendant Wright's acceptance of responsibility, the PSI states that not only did Wright commit the crime but also that Wright pled nolo contendere, adjudication was withheld, and she was sentenced.  But that is not all.  In her amended response to the PSI, Wright admits that she entered a nolo contendere plea for the September 17, 2015 possession of marijuana.[8]

"A diversionary disposition resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial proceeding is counted as a sentence under §4A1.1(c) even if a conviction is not formally entered."  § 4A1.2(f); see also United States v. Tamayo, 80 F.3d 1514, 1522 (11th Cir. 1996).  Because "prior sentence" means a sentence imposed upon adjudication of guilt, a sentence where adjudication of guilt is withheld does not fall under the definition of "prior sentence" in § 4A1.2(a)(1).  United States v. Rockman, 993 F.2d 811, 813 (11th Cir. 1993).  However, if a defendant pled nolo contendere to the prior offense and the state court withheld adjudication of guilt, the prior offense is a diversionary disposition that is properly counted as a "prior sentence" under § 4A1.1(c).  Id. at 814; see also Tamayo, 80 F.3d at 1522.

_____

[8]Wright's response to the PSI argues that considering the nolo contendere plea would be unfair because she was unrepresented when she entered the plea, there was no adequate plea colloquy, and because there was no proper description of the contraband.  This argument is unpersuasive.

28

Because defendant Wright's September 17, 2015 crime involved a diversionary disposition resulting from a <u>nolo contendere</u> plea, that diversionary disposition counts as a sentence under U.S.S.G. § 4A1.1(c) even though adjudication of guilt was withheld.  The district court properly assigned one criminal history category point to that 2015 crime.

In contrast, the record is unclear as to what transpired with respect to defendant Wright's March 3, 2013 possession of marijuana, specifically whether there was a plea of some sort or an adjudication of guilt.  There is an insufficient factual basis and no fact finding in the current record about this offense.  On remand, the district court should make fact findings about this March 3, 2013 possession offense and whether a criminal history category point should be assigned to this crime.

## B.    Three Convictions for Driving with a Suspended License

Defendant Wright received one criminal history category point for each of her three sentences for driving with a suspended license, for a total of three points. <u>See</u> U.S.S.G. § 4A1.1(c) (stating "[a]dd 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this subsection").  The question before us is whether those prior sentences were properly counted separately or should be treated as a single or two sentences.

29

The guidelines instruct that, for purposes of calculating the criminal history category, if a defendant has multiple prior sentences, the court must "determine whether those sentences are counted separately or treated as a single sentence." U.S.S.G. § 4A1.2(a)(2).  "Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense)."  Id.  "If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day."  Id.

An intervening arrest is one that comes in between the commission of the first criminal act and the second.  See United States v. Hunter, 323 F.3d 1314, 1323 (11th Cir. 2003).  For example, in United States v. Wilks, a case where this Court had to determine whether prior offenses were separate for purposes of the career offender enhancement, this Court counted Wilks's past offenses as separate because of an intervening arrest:

> Although consolidated for sentencing on the same day, Wilks' first conviction was for a charge of aggravated assault on a law enforcement officer stemming from an arrest on July 31, 1996. Wilks' second conviction stemmed from an arrest on August 15, 1996 for three separate crimes—grand theft, burglary with assault and strongarm robbery. Sixteen days separated the arrests for these two convictions. Because an intervening arrest separated the underlying predicate offenses, the district court did not err in counting them separately and enhancing Wilks' sentence under § 4B1.1.

30

464 F.3d 1240, 1244 (11th Cir. 2006).[9]

While each of defendant Wright's three offenses for driving with a suspended license occurred on a different date, Wright was simultaneously adjudicated guilty on February 28, 2012, for all three and simultaneously sentenced to time served of 38 days.  Because Wright was sentenced for each offense on the same day, her sentences for driving with a suspended license should be counted separately only if there were intervening arrests. U.S.S.G. § 4A1.2(a)(2).

The PSI sets forth the following facts about defendant Wright's three convictions for driving with a suspended license.  On August 10, 2011, an officer issued a citation to Wright for driving while her license was suspended.  Wright was not taken into custody at that time.  On September 20, 2011, a capias, or arrest warrant, was issued.  On October 24, 2011, Wright was arrested on the capias.

The PSI also states that, on October 24, 2011, an officer arrested defendant Wright for driving with a suspended license.  A capias issued on November 23, 2011, and Wright was arrested on the capias on January 22, 2012.

---

[9]We review for clear error a district court's determination that prior sentences (and underlying offenses) are not related under § 4A1.2.  See United States v. Hernandez-Martinez, 382 F.3d 1304, 1306 (11th Cir. 2004).  Thus, a district court's factual determination that a defendant's prior sentences are independent for purposes of determining the criminal history will not be disturbed unless clearly erroneous.  See id. at 1306 n.1.

On November 26, 2011, an officer issued a citation to defendant Wright for driving while her license was suspended. A capias issued, and Wright was arrested on the capias on January 22, 2012.

In sum, defendant Wright was arrested on October 24, 2011 on the second offense, and she committed the third offense on November 26, 2011. Thus Wright had an intervening arrest between the second and third offenses. These two sentences should be counted separately and qualify Wright for two criminal history category points.

The dispute here then is whether "the citation" defendant Wright received for the first violation constitutes "an arrest" under § 4A1.2(a)(2), so that she has an arrest between the first and second violations, which would make the first violation count separately as well. The Eleventh Circuit has never decided this "citation" issue. Two other circuit courts have and are divided on the issue.

The Ninth Circuit squarely held that a traffic citation is not an arrest under § 4A1.2(a)(2), while the Seventh Circuit reached the opposite conclusion. Compare United States v. Leal-Felix, 665 F.3d 1037, 1044 (9th Cir. 2011) (en banc) (driving with a suspended license) with United States v. Morgan, 354 F.3d 621, 624 (7th Cir. 2003) (driving with a suspended license).[10]

---

[10]We recognize that the Sixth Circuit has addressed a summons to appear in court on a criminal charge (aggravated assault) and concluded that the distinction between a summons and a traffic citation is "immaterial" and that a summons is not an arrest under another guideline.

32

After reviewing these decisions, we hold only that defendant Wright's traffic citation for driving with a suspended license is not an arrest under § 4A1.2(a)(2) of the Sentencing Guidelines for several reasons.

First, the Sentencing Guidelines do not define the term "arrest." "When a statutory term is undefined, courts give it its 'ordinary meaning' or 'common usage.'" United States v. Lopez, 590 F.3d 1238, 1248 (11th Cir. 2009) (citations omitted). Indeed, the "starting point for all statutory interpretation is the language of the statute itself." United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th Cir. 1999). Courts generally "assume that Congress used the words in a statute as they are commonly and ordinarily understood." Fed. Reserve Bank of Atlanta v. Thomas, 220 F.3d 1235, 1239 (11th Cir. 2000).

The term "arrest" ordinarily means that someone has been seized and taken into custody, however briefly. See, e.g., Knowles v. Iowa, 525 U.S. 113, 117, 119 S. Ct. 484, 487-88 (1998) (using "arrest" to mean "custodial arrest" and distinguishing the issuance of a citation from a custodial arrest).

Second, an arrest is usually "indicated by informing the suspect that he is under arrest, transporting the suspect to the police station, and/or booking the suspect into jail." Leal-Felix, 665 F.3d at 1041. In contrast, if someone, like defendant Wright, is pulled over, issued a traffic citation, and then allowed to

United States v. Powell, 798 F.3d 431, 438, 440 (6th Cir. 2015). We have no occasion to address a summons to a felony criminal charge here.

33

leave, that traffic-law violator would say she got a ticket, not that she had been arrested. The person would have only been stopped temporarily, not arrested, and then allowed to go on her way.

The concurring opinion to the Ninth Circuit's Leal-Felix decision aptly explained why the ordinary and common meaning of "arrest" does not include a traffic citation, more often called a "traffic ticket":

> I am confident that an average citizen—with or without a law degree—would not believe he had been arrested if pulled over, briefly detained and issued a traffic ticket. Indeed, if a traffic citation constituted an arrest in ordinary parlance, then aspiring police officers and prison guards might have a lot more to disclose on their job applications. Young drivers would need to be more concerned about getting into college, and those filling out employment applications, background checks, visa applications, and adoption papers would need to employ an entirely different "truth-o-meter" than commonly understood. It seems unlikely, however, that police departments, prisons, colleges, government agencies and adoption organizations mean—or are even concerned about—speeding tickets when they ask if applicants have ever been arrested. In other words, treating an ordinary traffic ticket as an arrest defies our common experience and would be a paradigmatic shift.
>
> . . . .
>
> The ordinary person's expectations when being taken into police custody, on the other hand, include hearing phrases like "you're under arrest" or "you'll need to come to the station" and perhaps being handcuffed and spending some time in the back of a squad car, if not in jail. That brief, embarrassing moment when a driver is stopped and given a ticket for speeding or driving with a broken tail light surely is not perceived as an arrest. Accordingly, I have no trouble concluding that the average driver in the United States does not believe he's in custody when he is pulled over and asked for his license, and the

34

> "ordinary, contemporary, common meaning" of the term arrest does not include a traffic citation.

Id. at 1045-46 (McKeown, J., concurring).

"Limiting 'arrest' to a formal arrest (rather than a mere [traffic] citation) is consistent with common usage, case law, and the context and purposes of the Sentencing Guidelines." Id. at 1041. Furthermore, the Sentencing Commission easily could have used a term broader than "intervening arrest" in § 4A1.2(a)(2) if it meant to include traffic citations. We conclude that the meaning of "arrest" for purposes of § 4A1.2(a)(2) does not include being pulled over, briefly stopped, and issued a traffic citation.

Here, defendant Wright's first citation on August 10, 2011 for driving with a suspended license does not constitute an intervening arrest under § 4A1.2(a)(2), and thus no intervening arrest occurred between her first and second offenses. Because the first and second offenses were not separated by an intervening arrest and the sentences for each were imposed on the same day, these two offenses should be treated as a single sentence. See U.S.S.G. § 4A1.1(a)(2).

As explained above, Defendant Wright's third citation for driving with a suspended license occurred on November 26, 2011. The October 24, 2011 arrest separated her first and second offenses (resulting in a single sentence) from her third. These were thus two separate offenses and were correctly treated as separate

35

sentences for which she should receive two total criminal history category points. See U.S.S.G. § 4A1.1(a)(2).

Even with one less criminal history category point for the three driving with a suspended license convictions, defendant Wright would still have four criminal history category points and a criminal history category of III. But if Wright's March 3, 2013 marijuana possession does not count, Wright would have three criminal history points, which would yield a criminal history category of II. Therefore, on remand the district court must make additional fact findings and determine whether the 2013 marijuana possession counts or not.[11]

## VI.  CONCLUSION

Based on the foregoing reasons, we vacate defendant Wright's sentences and remand to the district court for proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[11]Given the procedural errors in calculating Wright's criminal history category, we do not reach Wright's arguments regarding the substantive reasonableness of her sentence.

36