[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10520

_____

D.C. Docket No. 1:14-cr-00192-ODE-AJB-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

FREDERICK JENKINS,
WILLIE JENKINS,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(August 29, 2019)

Before MARTIN and ROSENBAUM, Circuit Judges, and MARTINEZ,* District
Judge.

---

* Honorable Jose E. Martinez, United States District Judge for the Southern District of
Florida, sitting by designation.

PER CURIAM:

Defendants-Appellants brothers Frederick and Willie Jenkins owned several tax-preparation businesses.  After trial, a jury found them guilty of multiple counts each of preparing and presenting false tax returns in violation of 26 U.S.C. § 7206(2) and one count each of conspiracy to prepare and present false tax returns in violation of 18 U.S.C. § 371.  The Government's theory at trial was that the brothers falsified information on the Schedule C of their customers' returns without the taxpayers' knowledge.  At sentencing, the district court calculated the total tax revenue lost due to the Jenkins brothers' crimes based on all of the tax returns that the brothers' business filed in the same period that shared certain characteristics with the particular returns that the Government had proven fraudulent beyond a reasonable doubt at trial.

A panel of this Court vacated the Jenkins brothers' original sentences because it found that the Government had not presented sufficient evidence at sentencing to support the court's tax-loss calculation.  On remand, the district court heard new evidence about the extent of the tax loss caused as a result of the Jenkins brothers' conspiracy.  The court made a new tax-loss calculation based on that new evidence and used the new calculation in imposing new sentences.

On appeal, the Jenkins brothers argue that the district court improperly went beyond this Court's mandate when it heard new evidence, that the Government's

2

new evidence was unreliable, that the Government's statistical analysis was inaccurate, and that the Jenkins brothers' sentences were substantively unreasonable because the district court allegedly relied in part on Appellants' statements about "political stuff" when imposing sentence.  After careful review, we affirm.

## I.

In 2015, a grand jury returned an indictment charging Willie Jenkins with 12 counts of preparing and presenting false returns in violation of 26 U.S.C. § 7206(2).  The indictment also charged Fred Jenkins with six counts of that crime.  In addition, the indictment charged both defendants with one count each of conspiring to commit those offenses in violation of 18 U.S.C. § 371.

The Jenkins brothers proceeded to trial.  During trial, the Government dropped two of the preparing-and-presenting-false-tax-returns charges against Willie Jenkins.  After trial, a jury found both Jenkins brothers guilty of conspiracy:  Fred Jenkins guilty of ten counts of preparing and presenting a false return, and Willie Jenkins guilty of six counts of preparing and presenting a false return.

At the Jenkins brothers' original sentencing, the Government sought to prove that the defendants' crimes had caused $14 million of lost tax revenue.  The prosecution reached that amount by examining 10% of the returns that the Jenkins brothers' business filed that included Schedule Cs, adding up the reported business losses, multiplying that number by 10 to arrive at an estimated total number of

3

business losses for all the returns, and then, following the Sentencing Guidelines' instructions for calculating lost tax revenue, taking 28% of that total. *United States v. Jenkins*, 701 F. App'x 897, 901 (11th Cir. 2017). The Government contended that the total business losses reported on those returns could be treated as fraudulent because the Jenkins brothers' business prepared all of them during the same period and because they reported similar types of losses from advertising and office expenses. *Id.* The court accepted the Government's tax-loss calculation and, partly on the basis of that calculation, sentenced Fred Jenkins to an aggregate prison term of 78 months and Willie Jenkins to an aggregate prison term of 75 months.

In their first appeal, the Jenkins brothers made arguments attacking the validity of their convictions as well as their sentences. We affirmed Appellants' convictions. *Jenkins*, 701 F. App'x at 899-900. However, we reversed the Jenkins brothers' sentences because the tax-loss calculation at the first sentencing proceeding was not supported by the preponderance of the evidence. We held that the shared characteristics between the returns that the Government proved fraudulent at trial and the returns presented at sentencing, by themselves, did not establish that the Jenkins brothers had willfully included fraudulent information in all of the sentencing returns. *Id.* at 902. A panel of this Court "vacate[d] their sentences," concluding their opinion with the following language: "AFFIRMED IN PART,

4

VACATED IN PART, AND REMANDED FOR RESENTENCING." *Id.* at 902-903.

Shortly after we issued our opinion, Willie Jenkins sought to expedite issuance of the Court's mandate. As part of its response to that motion, the Government requested that the Court "clarify the scope of the remand" to expressly provide that it would be permitted to present new evidence on remand. Without elaborating, we granted Willie's motion to expedite the issuance of the mandate and denied the Government's request to clarify the Court's mandate.

On remand, the Government requested that the district court allow it to present new evidence. In particular, the Government told the court that it planned to reach out to the taxpayers listed on the randomly selected returns presented at the first sentencing proceeding to determine whether each taxpayer in fact incurred the business expenses listed on the return. If the taxpayer did not own the listed business or incur the reported expenses, the Government said, testimony to that effect would prove that the return was fraudulent and would cure the defect identified on appeal. The Jenkins brothers opposed the Government's position and argued that the district court was not authorized to hear new evidence on remand unless this Court expressly allowed it to do so.

The district court opined that it was "unusual" for the court to hear new evidence at a resentencing hearing and that the Government generally got only "one

bite at the apple." But the court granted the Government's request because "the defendants carried out a massive fraud on our government" and because their "culpability . . . is so high."

At the resentencing hearing, the Government called IRS Special Agent Richard Thomas. He testified that investigators took a random sample of 10% of the returns that included a Schedule C, that were filed by the Jenkins brothers' company during the relevant period. That sample included 283 returns. For those, Thomas and other government agents attempted to contact all 228 taxpayers whose returns had Schedule Cs that reported a loss. Ultimately, he said, agents were able to contact 108 of the taxpayers. Of those, 34 responded that they did not own the business described on the Schedule C on their returns, did not have the reported business expenses, and had not informed defendants' business that they had those expenses. Those facts indicated to Thomas that the returns associated with those taxpayers were fraudulent. In total, those taxpayers had used the Jenkins brothers' company to file 37 returns. The Government added that two of the returns in the random sample had been the subject of substantive counts of preparing and presenting false returns at trial, upon which the defendants had been convicted, which brought the total number of proven-fraudulent returns in the random sample to 39.

6

Based on Agent Thomas's testimony, the Government argued that the Jenkins brothers were accountable for $2,421,347 of lost tax revenue.  The Government started its calculation by dividing the total number of proven-fraudulent returns in the random sample (39) by the number of returns reporting business losses in the random sample (228) for a "fraud rate" of 17.1%.  Then, it calculated the tax-loss amount from the reported business losses by adding up the losses from the random sample, multiplying that number by ten, and taking 28% of that total.  That calculation resulted in a tax loss attributable to reported business losses of $14,243,219.  Finally, to determine the amount of the tax loss attributable to the Jenkins brothers' fraud, the Government multiplied the tax-loss amount by the fraud rate (17.1%), for a tax loss of $2,421,347.

The Government also presented an alternative calculation in which it divided the total number of proven-fraudulent returns in the random sample (39) by all 283 of the tax returns from the random sample, including the 55 returns that reported a profitable business, and then conducted the remaining calculations.  That calculation resulted in $1,951,321 of tax loss attributable to the Jenkins brothers' fraud, coinciding with the same base offense level.

The defense called Jeffrey Martin, an expert in statistics.  Martin agreed that the agents' initial sample of 283 tax returns was random but said that removing the 55 returns that reported a profitable business made the sample not random.  And

7

since the sample was not random, Martin said, the Government's extrapolated loss calculation was not reliable. Using only the evidence presented at trial, Martin calculated the tax loss attributable to the Jenkins brothers as roughly $40,000.

The defense also called Joseph Robuck, an investigator. Robuck interviewed 58 of the taxpayers, including 26 of the taxpayers whom the Government identified as having fraudulent tax returns. Robuck's employee attempted to contact Kesert Mullings, whose return the Government had identified as reporting fraudulent business expenses. The employee reported that the agents had actually spoken with Mullings's father, not the taxpayer himself. But when Robuck located and identified the correct Kesert Mullings, Mullings confirmed that he did not have any business expenses for the tax year in question. Robuck's employee also contacted Misty Davis, who the Government said stated that she had no business expenses for the year of the tax return in question. According to Robuck, Davis said that she had told the IRS that she had not personally done her taxes but that her former husband had done the taxes. When Robuck interviewed Davis's former husband, he confirmed that Davis had not had business expenses. Robuck also criticized the agents' investigation into the returns that the Government ultimately concluded had not been fraudulent. Finally, Robuck opined that the manner in which the IRS conducted its investigation had been inherently unreliable because the taxpayers were not sophisticated and because the agents spoke with them only briefly by phone.

8

Overall, although Robuck said that he had found "inconsistencies" in the Government's investigation, he conceded he had not found "errors."

Finally, the defense called Art McGovern, one of Robuck's employees. Referring to the Government's spreadsheet showing all 5,011 of the tax returns filed by defendants' company during the relevant years, McGovern said that the electronic filing information reported that Willie Jenkins was not listed as the official preparer on any of them. Fred Jenkins was listed as the preparer of 2,120 of them, or 42% of the total. McGovern then attested that the total amount of business losses reported on returns that were proven fraudulent and that listed Fred as the preparer was $64,166.

After hearing the parties' arguments, the district court addressed the tax-loss calculation issue. In response to defendants' argument that the court should not consider any of the new evidence, the court concluded that it was "reasonable for [it] to look at the new evidence that both sides have put in in determining what the correct sentence is." The court also rejected the Jenkins brothers' argument that the court should not have considered the returns that did not list either of them as the official preparer. The court recalled that, at trial, it had heard evidence that the person listed as the preparer on the returns was often someone other than one of the defendants, even when one of the defendants had in fact prepared the return. Based on that evidence, the court concluded that "Fred and Willie were both doing the same

9

thing," preparing fraudulent tax returns, and had also "conspired with each other" to carry out their scheme. And, the court said, the trial evidence showed that their methods "were not idiosyncratic" but contained a "pattern and practice of conduct," which caused it to infer that "this same type of fraud" was not "confined" to the returns described at trial.

The court next addressed the sufficiency of the Government's evidence to prove the extent of the tax loss caused by the Jenkins brothers' fraud. It found that the discrepancies identified by the defense did not render the agents' results unreliable. Rather, the court credited the IRS agent's testimony and concluded that the Government had demonstrated that 39 of the returns were fraudulent "through and through." Dividing that number by 228, which did not include the 55 returns in the random sample that had reported a profitable business, the court agreed with the Government that the fraud rate was 17.1% and extrapolated that rate to calculate a total tax loss of $2,421,347.

Taking that calculation into account and imposing a two-level increase for being in the business of preparing tax returns, the court concluded that defendants had an offense level of 24 and a guidelines range of 51 to 63 months.

After hearing the parties' arguments, the court sentenced Fred Jenkins to an aggregate term of 63 months in prison and Willie Jenkins to an aggregate sentence of 60 months. The court said that it chose those sentences because of the Jenkins

10

brothers' "very serious" and "highly intentional" conduct.  The court also pointed to the "political stuff" that the Jenkins brothers discussed with their clients that was "meant to demean the government."  The court further explained what it meant when it referred to "political stuff":

> During the trial and sentencing hearing, the defendants gave indications of having bought into the sovereign citizen rhetoric.  The business about you have to file a claim against my estate to have any type of legal claim which is, of course, all totally bogus, and I'm convinced they knew it was bogus, and to me when I hear that type of language coming from a defendant, it just screams of fraud.  The only people who say that kind of stuff are people who are out to defraud these days.

Defense counsel objected to the Government's presentation of additional evidence, the court's calculation of the recommended guidelines range, and the court's consideration of what the Jenkins brothers characterize as their "political statements."

This appeal followed.

## II.

We review *de novo* a district court's compliance with our mandate in a previous appeal.  *United States v. Crape*, 603 F.3d 1237, 1241 (11th Cir. 2010).  We also review *de novo* a sentencing court's application of the Sentencing Guidelines and accept the court's factual findings unless they are clearly erroneous, reversing only if we are left with a definite and firm conviction that a mistake has been

11

committed.  *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017).  Where the sentencing court's findings of fact are erroneous, the error is not reversible where the court would have imposed the same sentence had the court considered the proper facts.  *See United States v. Kendrick*, 22 F.3d 1066, 1069-70 (11th Cir. 1994).  If an error did not affect the guidelines range, it is harmless.  *United States v. Bradley*, 644 F.3d 1213, 1292 (11th Cir. 2011).

We review the procedural and substantive reasonableness of a sentence for an abuse of discretion, *United States v. Alberts*, 859 F.3d 979, 985 (11th Cir. 2017), but review *de novo* whether the sentencing court considered an improper factor.  *United States v. Velasquez Velasquez*, 524 F.3d 1248, 1252 (11th Cir. 2008).

## III.

### A.

As a threshold issue, the Jenkins brothers argue that the district court abused its discretion when it allowed the Government to present new evidence on remand. We disagree.

On remand, a district court is bound by the findings of fact and conclusions of law made by an appellate court in a prior appeal in the same case.  *United States v. Amedeo*, 487 F.3d 823, 829 (11th Cir. 2007).  When "acting under an appellate court's mandate, a district court 'cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent

12

error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.'" *Id.* at 830 (quoting *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996)).

In general, we view a criminal sentence as "a package of sanctions that the district court utilizes to effectuate its sentencing intent consistent with the Sentencing Guidelines." *United States v. Stinson*, 97 F.3d 466, 469 (11th Cir. 1996). In this Circuit, "as a general matter, . . . when a sentence is remanded on appeal, the sentencing process commences again *de novo*." *United States v. Grant*, 397 F.3d 1330, 1336 (11th Cir. 2005). So when this Court vacates a sentence and remands a case to the district court for resentencing, this Court's mandate vacates the sentence in its entirety. *Stinson*, 97 F.3d at 469.

However, in appropriate cases we have narrowed our mandate to prohibit the Government from introducing new evidence at resentencing where the Government was aware of a defense objection to its sentencing evidence and had the opportunity to present additional evidence in response to that objection. *See*, *e.g.*, *United States v. Wright*, 862 F.3d 1265, 1276 (11th Cir. 2017); *United States v. Washington*, 714 F.3d 1358, 1362 (11th Cir. 2013); *United States v. Canty*, 570 F.3d 1251, 1257 (11th Cir. 2009). In those cases, we expressly mandated that the Government was not allowed to present additional evidence at resentencing.

13

In resolving the Jenkins brothers' first appeal, we did not narrow our mandate. Instead, we vacated the Jenkins brothers' sentences in their entirety and remanded for resentencing. *See Jenkins*, 701 F. App'x at 902-903. The district court therefore acted within its discretion when it began resentencing "*de novo*" and allowed the Government to present new evidence. *Grant*, 397 F.3d at 1336.

The Jenkins brothers' arguments on appeal to the contrary are not persuasive. They say that their motion to expedite the issuance of this Court's mandate was premised on the Government's not being permitted to present new evidence, and that the district court therefore violated this Court's "implied" holding. But a district court is bound by an implied holding only when our decision resolved that issue "by *necessary* implication." *Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir. 1985) (emphasis added). Our decision to expedite issuance of the mandate in the earlier appeal was not predicated on a decision to narrow our mandate. The Jenkins brothers also argue that the sentencing court applied the wrong legal standard when it decided to hear new evidence, but its decision to do so was well within its wide discretion to hear evidence at sentencing.

## B.

Next, the Jenkins brothers contend that the sentencing court's tax-loss calculation was error because the Government's evidence was unreliable and because the court's statistical extrapolation of the total lost tax revenue was flawed.

14

We agree only that the district court, in extrapolating the amount of total tax loss, should not have excluded from the calculation the 55 returns that reported a profitable business.    Nevertheless, correcting that error results in the same recommended guidelines range and does not otherwise affect the sentencing court's bases for the Jenkins brothers' sentences.    So while the tax-loss calculation was flawed in part, the error was harmless.

Where a defendant challenges one of the Government's factual bases for that defendant's sentence, the Government bears the burden of proving that fact by a preponderance of evidence, and the Government must satisfy its burden with specific and reliable evidence.  *United States v. Gupta*, 572 F.3d 878, 887 (11th Cir. 2009). District courts may make loss determinations based on evidence at trial, in addition to evidence at a sentencing hearing.  *United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011).  Nor must a sentencing court "constrain itself to absolute figures"; instead, it may "rely on 'specific circumstantial evidence' to estimate the amount of loss."  *Id.* (quoting *United States v. Willis*, 560 F.3d 1246, 1251 (11th Cir. 2009)). But while a court can rely on estimates, it "'must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines.'"  *Id.* (quoting *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997)).  As we apply these rules, we keep in mind that §1B1.3(a)(1)(B) of the Sentencing Guidelines makes clear that a defendant is responsible for "all acts and

15

omissions of others that were (i) within the scope of [a] jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." *United States v. Presendieu*, 880 F.3d 1228, 1245 (11th Cir. 2018); *see also United States v. McCrimmon*, 362 F.3d 725, 731 (11th Cir. 2004). Finally, "'[d]istrict courts are in a unique position to evaluate the evidence relevant to loss determination,'" so we "must give their determinations 'appropriate deference.'" *United States v. Whitman*, 887 F.3d 1240, 1248 (11th Cir. 2018) (quoting *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015)).

When we apply these standards, we must conclude that the sentencing court's tax-loss-amount calculation is no cause for reversal. For example, it was not clear error to decline to rely on the evidence that neither Fred nor Willie Jenkins were listed as the official "preparer" on many of the tax returns when the court held both Jenkins brothers accountable for losses attributable to returns where they were not identified as the preparer. As the sentencing court observed, evidence at trial proved that the person listed as the preparer on a given return was not always the person who in fact prepared the return. Indeed, the jury necessarily rejected the Jenkins brothers' argument because it found both defendants guilty of substantive counts where they were not listed as the official preparer on the return.

The district court also did not clearly err when it credited the Government's witnesses, even though the defense witness had identified inconsistencies in the

16

agents' investigation. The defense investigator noted inconsistencies with the Government's investigation into returns associated with taxpayers Davis and Mullings, but the investigator also confirmed that those taxpayers had not incurred the business expenses that were reported on their returns. Thus, even accepting that the defense investigators identified inconsistencies in the Government's investigation, the sentencing court was correct to conclude that the returns associated with those taxpayers had been fraudulent. The rest of the inconsistencies the investigator observed concerned tax returns that the Government did not identify as having been fraudulent, so they could not have had any effect on the tax-loss calculation. And to the extent the Jenkins brothers assert those discrepancies were so troubling that all of the Government's evidence was unreliable, the district court did not clearly err by crediting the Government's witness.

Finally, the Jenkins brothers contend that the Government's extrapolation was statistically unreliable because it ignored 55 tax returns that reported profitable businesses. We agree, but that error was harmless.

As the Jenkins brothers' statistics expert testified, the Government's tax-loss calculation started with a random sample of 10% of the returns. But when the Government disregarded 55 of those returns, the sample became biased in favor of fraudulent returns. Taking those returns into account, however, the tax loss attributable to the Jenkins brothers' fraud is $1,951,321, which falls within the same

17

guidelines range as the district court's tax-loss finding. *See* U.S.S.G. §2T4.1. The tax-loss amount did not otherwise affect the district court's decision to impose sentences on the high end of the guidelines range, so the court's error in calculating the tax-loss amount would not have resulted in different sentences and was therefore harmless. *See Bradley*, 644 F.3d at 1292; *Kendrick*, 22 F.3d at 1069-70.

## C.

Finally, the Jenkins brothers argue that their sentences are substantively unreasonable because, in pronouncing their sentences, the court mentioned that they had made certain "political statements" to their clients that were meant to "demean the government," which Appellants say was an improper consideration. We disagree because, in context, the court's consideration of the Jenkins brothers' alleged "political statements" referred to the nature and circumstances of the offense, not to the Jenkins brothers' exercise of their First Amendment rights.

The First Amendment protects an individual's speech and right to join groups and associate with others holding similar beliefs, but it "does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson v. Delaware*, 503 U.S. 159, 164-65 (1992). Rather, as we have previously held, the First Amendment "only protects 'a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being

18

tried.'"  *United States v. Serrapio*, 754 F.3d 1312, 1322 (11th Cir. 2014) (quoting *Dawson*, 503 U.S. at 168).

Here, the district court properly considered the Jenkins brothers' sovereign-citizen rhetoric because it had a bearing on the nature, circumstances, and seriousness of the offense.  *See* 18 U.S.C. § 3553(a).  The court did not consider the Jenkins brothers' apparent sovereign citizen beliefs on their own.  Quite the opposite.  The court actually observed that the Jenkins brothers "knew" that the sovereign-citizen theories were "bogus" and opined that the only reason they espoused those beliefs was because they were "out to defraud."  The district court was permitted to account for this in determining its sentence.

## IV.

In sum, we affirm Appellants' sentences.

**AFFIRMED.**

19